**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RAYMOND GONZALES,**

                                        **Plaintiff,**

        **-against-**                                        **9:06-CV-1424**
                                                             **(JMH)**

**DR. LESTER WRIGHT, et al.,,**

                                        **Defendants.**
_____

**DECISION and ORDER**

**HOOD, D. J.:**

        Raymond Gonzales complains in this action brought pursuant to
42 U.S.C. § 1983 that, while he was incarcerated at the Upstate
Correctional Facility ("Upstate"), Defendants, various New York
penal officers and employees, denied him the protections of the
Fourth, Eighth and Fourteenth Amendments to the United States
Constitution.[1]   The matter is before the Court on Defendants'

_____

        [1]  The Eleventh Amendment recognizes the fundamental
principle of sovereign immunity.  Thus, the Eleventh Amendment
bars any suit in federal court against a state by citizens of
another state. Further, the Supreme Court has held that the
amendment also bars a citizen from bringing a suit against his or
her own state in federal court. *Hans v. Louisiana*, 134 U.S. 1
(1890).  Sovereign immunity under the Eleventh Amendment protects
state agencies and department sas well as the state itself. As
the Supreme Court has noted: "It is clear, of course, that in the
absence of consent a suit in which the State or one of its
agencies or departments is named as the Defendant is proscribed
by the Eleventh Amendment. . . . This jurisdictional bar applies
regardless of the relief sought." *Pennhurst State School &
Hospital v. Halderman*, 465 U.S. 89, 100 (1984).  Moreover,
"[o]bviously, state officials literally are persons. But a suit
against a state official in his official capacity is not a suit
against the official but rather is a suit against the official's

motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 81).  Plaintiff having responded to the motion *sub judice* (Dkt. No. 88), it is ripe for review.

**Plaintiff's Allegations**

Plaintiff claims that beginning shortly after his arrival on July 3, 2006, in Building 10 SHU at Upstate Correctional Facility, some unidentified "infections harmful chemical substance" came out of the ventilation system.  Although Defendants John Finazzo and Gerald Caron looked for the substance, they claimed not to see anything and mocked him. (Dkt. No. 1, ¶¶ 38, 39). In response to his ongoing complaints, Plaintiff claims that Defendants James Spinner, Sheen Pombrio, Brian Grant, Michael Riley, Scott Dumas, Jonathan Price, Jeffrey Hyde, William Brown, and Lynn Furnace looked for the substance, but claimed that they did not see nor find anything. (Dkt. No. 1, ¶¶ 41, 42).

Plaintiff also claims that all the above-named Defendants, along with Defendants Steven Salls, Jeffrey Bezio, Ricky Colton, N. Guerin, Dean Sauther, Brian Bogardus, Michael Welch, Michael

---

office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

As Plaintiff is suing Defendants only in their official capacities, the action would be subject to dismissal on this ground alone.  However, Plaintiff's failure to seek relief against Defendants in their individual capacities could be remedied through amendment.

Albert, and non-movant D. Ravelle[2], made comments and placed "infections harmful chemical substance" in the ventilation system in retaliation for filing lawsuits at other facilities and that Defendants Robert Woods and Norman Bezio directed this conspiracy. (Dkt. No. 1, ¶¶ 45-50). Defendant Bogardus is alleged to have gestured and looked with satisfaction and gladness towards the ventilation system while delivering mail. (Dkt. No. 1, ¶ 55). Plaintiff also states that the above-named Defendants tried to poison his food with an unknown "infectious chemical substance." (Dkt. No. 1, ¶¶ 108-110)[3].

Plaintiff further alleges that the above Defendants denied him access to the courts by denying him a pen needed to complete his 45 page, 177 paragraph complaint as well as legal work related to his other pending lawsuits. (Dkt. No. 1, ¶¶ 162-67). Plaintiff claims that he requested a pen from the correctional officers as supplies were given out and was repeatedly denied one. (Dkt. No. 1, ¶¶ 127, 129, 132, 162-67, 170-71).

Additionally, Plaintiff alleges that after his food was

---

[2] Although named as a Defendant, D. Ravelle has never been served with process or appeared in this action. By separate order, Plaintiff will be required to show cause why this action should not be dismissed as to this Defendant pursuant to Fed. R. Civ. P. 4(m).

[3] Additionally, though not in his complaint, Plaintiff also alleges that as a part of this conspiracy laser beams were shot at him through the lights in his cell. (Dkt. No. 81-3, Ex. A, 14.)

supposedly tainted he refused to return his food tray (Dkt. No. 1, ¶¶ 130, 168-69) which prompted a search of Plaintiff's cell. (Dkt. No. 1, ¶¶ 126, 134-41).  Plaintiff further alleges that during the cell search, the officers damaged his legal documents in retaliation for his other lawsuits against DOCS employees at other correctional facilities. (Dkt. No. 1, ¶¶ 142-43).  Plaintiff further alleges that the cell search was unlawful because he said he returned all the pieces of the broken food tray. Therefore, the officers had no right to conduct the search, and did it for the sole purpose of retaliation. (Dkt. No. 1, ¶¶ 142-43).

Plaintiff alleges that due to the "infectious harmful chemicals," his face, chest, and other body parts became infected. (Dkt. No. 1, ¶ 43).  Due to Plaintiff's alleged "infections, he made several sick call requests, requesting medical attention for his "infections." (Dkt. No. 1, ¶¶ 44, 74, 85). Plaintiff also wrote letters to Facility Health Service Director Wiessman requesting medical care. (Dkt. No. 1, ¶ 74).  Plaintiff also wrote Lester Wright, the Associate Commissioner of Health Services/Chief Medical Officer of New York State Department of Correctional Services at Albany, asking Wright to order Defendant Louise Tichenor to provide Plaintiff with medical care. (Dkt. No. 1, ¶ 78). Plaintiff claims that, although seen by Defendant Tichenor on July 14, 2006, he did not receive proper medical care. (Dkt. No. 1, ¶ 77).  Thus, Plaintiff alleges that Defendant Evelyn Wiessman, failed to

4

properly supervise Plaintiff's medical providers. (Dkt. No. 1, ¶ 7A).

Plaintiff also alleges that Defendant Tichenor failed to adequately examine him during his medical call out on July 14, 2006, asking with intrigue what had happened to Plaintiff's skin, but failing to properly examine Plaintiff's chest, back, shoulders, testicles and penis. (Dkt. No. 1, ¶¶ 64, 66). Plaintiff also states that Defendant Tichenor prescribed him Loratadine, which Plaintiff refused to take because Plaintiff knew that he was given the medicine only to conceal and hide the evidence of the damage caused to him by the "infectious substances." (Dkt. No. 1, ¶¶ 68-69, 72). Plaintiff then states that he was given a prescription cream for his skin problem, but not enough of it. (Dkt. No. 1, ¶¶ 73, 75).

Plaintiff also alleges that Defendant Tichenor wrongfully discontinued and denied Plaintiff the nutritional supplement, Ensure, although Plaintiff acknowledges that he failed to comply with facility procedure by refusing to drink the Ensure in front of the Nurses. (Dkt. No. 1, ¶¶ 145-60).

Finally, Plaintiff alleges that nurses J. Chesbrough, R. Holmes, and Walsh failed to provide Plaintiff with non-prescription medication even though Plaintiff completed all required sick call procedures. (Dkt. No. 1, ¶¶ 85, 89-106). Plaintiff contends that all these Defendants were deliberately indifferent to his medical

needs.

## Defendants' Statement of Material Facts

Defendants have provided a different view of what happened while Plaintiff was confined at Upstate, as detailed in their statement of material facts.  Although quite lengthy, they are recounted in detail below to provide a better understanding of Defendants' position in the matter:

1. Plaintiff Raymond Gonzalez was seen on a nearly daily basis from his arrival at Upstate on or about July 3, 2006.  Weissman Declaration, Exhibit 1.

2. On July 5, 2006, Plaintiff demanded that he be given skin cream and became very agitated when he was told that he had to wait until he was examined by the PA in order to receive the cream.  Weissman Declaration, Exhibit 2.

3. Plaintiff also received an orientation on sick call procedure on July 5, 2006.  Weissman Declaration, Exhibit 3.

4. On July 6, 2006, Plaintiff refused to drink his Ensure in the presence of the nurse and became very vulgar and abusive. As a result, Plaintiff received a misbehavior report. Weissman Declaration, Exhibit 4.

5. On July 6, 2006, it was once again explained to Plaintiff that medical procedure required that Plaintiff consume the Ensure in view of the nurse to insure that it was properly consumed. *Id.*

6. Plaintiff was also informed that Ensure and skin cream would be withheld pending an examination by the PA. *Id.*

7. Plaintiff was again seen on July 8, 2006 and July 10, 2006 and requested skin cream and indigestion aids. Plaintiff did not exhibit any symptoms and continued to be very demanding.  Weissman Declaration, Exhibit 5.

8. On July 12, 2006, Plaintiff demanded Ensure,

ibuprofen and hemorrhoid cream and refused hepatitis B vaccination. Weissman Declaration, Exhibit 6.

9. On July 14, 2006, Plaintiff was examined by the PA. Weissman Declaration, Exhibit 8.

10. On July 15, 2006, Plaintiff demanded the medication ordered by the PA. Weissman Declaration, Exhibit 7.

11. On July 17, 2006, Plaintiff refused to be weighed and refused medication for allergies. Id.

12. On July 19, 20, and 21, 2006 Plaintiff refused treatment, demanded to see Dr. Weissman and was vulgar and loud indicating he did not want further treatment from the PA.  Weissman Declaration, Exhibit 9.

13.  On July 24, 2006, Plaintiff refused to be examined and became verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 10.

14. On July 25, 2006, the refusals and tirades were repeated and Plaintiff refused treatment. Id.

15. On July 26, 2006, Plaintiff once again refused to cooperate in his examination and treatment could not be provided. Once again, Plaintiff began to be verbally abusive, using the vilest of language, threats and sexually explicit rants.  Weissman Declaration, Exhibit 11.

16. On July 27, 2006, Plaintiff rejected his medication by throwing it on the floor and indicating that he did not want to be examined or treated by the PA. Id.

17. On July 28, 2007, Plaintiff refused treatment yet again. Additionally, Plaintiff continued to express that he did not want what was being prescribed. Weissman Declaration, Exhibit 12.

18. On July 29, 2006, Plaintiff once again refused to be examined and insisted that he be given medication without examination. Plaintiff also persisted in his abusive and vulgar language until he was given a misbehavior report. Weissman Declaration, Exhibit 13.

19. On July 30, 2006, Plaintiff continued to refuse

examination, making treatment impossible. Plaintiff
also refused to consume Ensure as directed and treated
the nurse to more vulgarity. Id.

20. On July 31, 2006, Plaintiff was again seen and
reminded that he was required to consume the Ensure in
the presence of the nurse or it would be discontinued.
Examination revealed that Plaintiff's face was clear
and had no redness, however, Plaintiff continued to
insist that his face was real bad, dry and itching.
Weissman Declaration, Exhibit 14.

21. On August 1, 2006, Plaintiff once again refused to
consume Ensure in the presence of the nurse and was
warned again that non-compliance would cause the Ensure
to be stopped.  Plaintiff continued to refuse to comply
and the Ensure was ordered stopped.  Weissman
Declaration, Exhibits 15-16.

22. On August 2, 2006, Plaintiff again refused to be
examined and became vulgar and abusive. An attempt to
talk with Plaintiff about taking Ensure was met with
more abuse and vulgarity. Plaintiff was finally given a
misbehavior report when he began to threaten staff.
Weissman Declaration, Exhibit 17.

23. On August 4, 2006, Plaintiff again refused to be
examined and refused treatment.  Once more the nurse
was treated to a vulgar and threat filled tirade. *Id*.

24. On August 5, 2006, Plaintiff was non-compliant with
sick call procedure. *Id.*

25. On August 6, 2006, Plaintiff again refused to be
examined and refused treatment.  Once more the nurse
was treated to a vulgar and threat filled tirade.
Weissman Declaration, Exhibit 18.

26. On August 7, 2006, Plaintiff's medicine was renewed
and once again he was uncooperative and vulgar and
received another misbehavior report. Weissman
Declaration, Exhibit 19.

27. On August 9, 2006, the PA examined Plaintiff and
Plaintiff was once more instructed that he must talk to
and cooperate with the nurse in order to be treated.
*Id.*

28. On August 8, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. Weissman Declaration, Exhibit 20.

29. On August 10, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. When told that he must cooperate, Plaintiff once more became enraged and vulgar and refused treatment. *Id.*

30. On August 12, 2006, Plaintiff failed to comply with sick call procedures.  Weissman Declaration, Exhibit 21.

31. On August 13, 2006, Plaintiff failed to comply with sick call procedures and instead exposed himself and stood silently as the nurse tried to examine and find out symptoms. *Id.*

32. On August 14 and 16, 2006, once more Plaintiff refused to speak and held up a piece of paper when asked what he needed. The session was ended with a vulgar threat.  Weissman Declaration, Exhibits 21 and 22.

33. On August 17, 2006, Plaintiff was treated for indigestion and allergies.  Weissman Declaration, Exhibit 22.

34. On August 18 and 19, 2006, Plaintiff refused to speak to the nurse doing sick call[,] thus, refusing to be evaluated and instead held up a piece of paper. Weissman Declaration, Exhibits 22 and 23.

35. On August 21, 2006, Plaintiff allowed an evaluation and was found to be without nasal congestion and a minor rash for which he was given medication.  It was noted that his face was clear of any rash.  Weissman Declaration, Exhibit 24.

36. On August 22, 2006, Plaintiff was once again non-compliant and abusive rendering any attempt to examine and treat him as impossible. *Id.*

37. On August 23, 2006, Plaintiff was once again non-compliant and abusive rendering any attempt to examine and treat him as impossible.  Medications were reordered in spite of Plaintiff's lack of cooperation. Weissman Declaration, Exhibit 25.

9

38. On August 24, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. *Id.*

39. On August 25 and 27, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibits 26 and 27.

40. On August 28, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. Weissman Declaration, Exhibit 27.

41. On August 31, 2006 and September 1, 2006, Plaintiff was once again non-compliant, vulgar and abusive rendering any attempt to examine and treat him as impossible. Weissman Declaration, Exhibits 27- 28.

42. On September 4, 2006, Plaintiff complained that he had a rash on his face, chest and back. Plaintiff was examined and no rash was seen. *Id.*

43. On September 5, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and no tenderness or redness was noted in his throat. Weissman Declaration, Exhibit 29.

44. On September 8, 2006, Plaintiff complained of gas and a rash on his testicles. Plaintiff was examined and irritation was noted and Plaintiff advised to keep clean and dry. *Id.*

45. On September 12, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and given fluids and dispensed medications. Weissman Declaration, Exhibit 30.

46. On September 13, 2006, Plaintiff requested sinus medication and antacid. Plaintiff was examined and given antacid and sinus medication. Weissman Declaration, Exhibit 31.

47. On September 15, 2006, Plaintiff complained of a sore on his penis. Plaintiff was examined and irritation was noted but there was no evidence of a fungal infection or broken skin. Plaintiff was given bacitracin ointment to apply. *Id.*

48. On September 17, 2006, Plaintiff did not comply

with sick call procedure and could not be evaluated or treated. *Id*.

49. On September 18, 2006, Plaintiff requested ibuprofen and hemorrhoid treatment.  Plaintiff was examined and give ibuprofen and hemorrhoid medication. Weissman Declaration, Exhibit 32.

50. On September 20, 2006, Plaintiff requested ibuprofen and antacid. Plaintiff was examined and treated with ibuprofen, antacid and warm compresses to his back. Weissman Declaration, Exhibit 33.

51. On September 20, 2006, Plaintiff refused to go to the infirmary for examination of possible tuberculosis infection.  Plaintiff became abusive and vulgar and received a misbehavior report. *Id*.

52. On September 21, 2006, Plaintiff again refused to be tested or evaluated.  Weissman Declaration, Exhibit 34.

53. On September 28 and 30, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated.  Weissman Declaration, Exhibit 35.

54. On October 3, 2006, Plaintiff complained of a headache, upset stomach and infected skin. Plaintiff was examined and given ibuprofen and antacid.  Weissman Declaration, Exhibit 36.

55. On October 4, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given ibuprofen and antacid. *Id*.

56. On October 6, 2006, Plaintiff's medications were renewed. *Id*.

57. On October 9, 2006, Plaintiff complained of a headache, cold sore and gas.  Plaintiff was examined and given ibuprofen, cold sore medication and antacid. Weissman Declaration, Exhibit 37.

58. On October 10, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given Tylenol and antacid. *Id*.

11

59. On October 11, 2006, Plaintiff complained of a
headache, rash and gas.  Plaintiff was examined and it
was noted that his penis was irritated.  Plaintiff was
given ibuprofen, bacitracin ointment and antacid. *Id*.

60. On October 23, 2006, Plaintiff complained of
infection on his back, chest and shoulders and demanded
to see Dr. Weissman.  Plaintiff was examined and no
sores or rash was noted. The skin appeared dry and
unremarkable. Plaintiff was given Tylenol and antacid.
Weissman Declaration, Exhibit 38.

61. On October 24, 2006, Plaintiff complained of
infection on his back, chest and shoulders and demanded
to see Dr. Weissman. Plaintiff was examined and no
sores or rash was noted, although a small patch of
dryness was noted on Plaintiff's thigh. The skin
appeared dry and unremarkable. Plaintiff was given
Tylenol and antacid. *Id*.

62. On October 25, 2006, Plaintiff complained of an
infected penis.  Plaintiff was examined and there was
no evidence of sores or breaks in the skin.  Weissman
Declaration, Exhibit 39.

63. October 26, 2006, Plaintiff refused to cooperate
with lab tests and with a consultation.  Plaintiff also
complained of an infected groin, face chest and head.
Plaintiff was examined and no infection was seen.
Weissman Declaration, Exhibit 40.

64. On October 30, 2006, Plaintiff once again refused
laboratory tests. *Id.*

65. On November 3, 2006, Plaintiff complained of gas
and a lip injury. Plaintiff was examined and give[n]
antacid and antibiotic cream for his lip. *Id.*

66. On November 4, 2006, Plaintiff did not comply with
sick call procedure and could not be evaluated or
treated.  Weissman Declaration, Exhibit 41.

67. On November 5, 2006, Plaintiff complained of gas
and a split lip. Plaintiff was examined and given
antacid and bacitracin for his lip. *Id*.

68. On November 6, 2006, Plaintiff complained of gas
and infected skin.  Plaintiff's wrist, face, head,

12

chest and back were examined but no infection could be found. Plaintiff was given antacid for his gas. Plaintiff continued to request Ensure but it was not ordered. Weissman Declaration, Exhibit 42.

69. On November 8, 2006, Plaintiff complained of gas and a split lip.  After examination Plaintiff was given triple antibiotic cream for his lip and antacid. *Id.*

70. On November 9, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

71. On November 10, 2006, Plaintiff received his quarterly review and examination.  Three issues were discussed. Plaintiff's lip was treated with bacitracin and antacids were given for his gas problem. It was determined that Ensure would not be restarted due to non-compliance with medical protocol.  Weissman Declaration, Exhibit 43.

72. On November 11, 2006, Plaintiff reported stomach problems and requested lip cream.  Following an examination it was determined that Plaintiff did not require additional lip cream and was give[n] Tylenol and antacid. *Id.*

73. On November 14, 2006, Plaintiff again requested antacid and lip cream.  Following an examination, it was determined that Plaintiff did not require any treatment other than antacid.  Weissman Declaration, Exhibit 44.

74. On November 15, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

75. On November 17, 2006, Plaintiff reported stomach upset and general body aches.  Following examination, Plaintiff was given antacid and analgesics for body pain. *Id.*

76. On November 18, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated.  Weissman Declaration, Exhibit 45.

77. On November 19 and 21, 2006, Plaintiff requested antacids and ibuprofen.  Plaintiff was examined and

given antacid and Tylenol.  Weissman Declaration,
Exhibits 45 and 46.

78. On November 22, 2006, Plaintiff requested antacids
and Tylenol.  Plaintiff was examined and given antacids
and Tylenol. Weissman Declaration, Exhibit 46.

79. On November 24, 2006, Plaintiff requested Ensure,
lip cream and antacids. Plaintiff was examined and
found to have no problems that required lip cream.
Plaintiff was also informed that Ensure was suspended
due to non-compliance.  Tylenol and antacid was
prescribed.  Weissman Declaration, Exhibit 47.

80. On November 27, 2006, Plaintiff requested Ensure,
lip cream and antacids.  Plaintiff was examined and
found to have no problems that required lip cream.
Plaintiff was also informed that Ensure was suspended
due to non-compliance.  Tylenol and antacid was
prescribed. *Id*.

81. On November 30, 2006, Plaintiff requested Ensure,
lip cream and antacids.  Plaintiff was examined and
found to have no problems that required lip cream.
Plaintiff was also informed that Ensure was suspended
due to non-compliance. Tylenol and antacid was
prescribed.  Weissman Declaration, Exhibit 48.

82. Defendants Tichenor, Wash, Holmes and Chesbrough
saw the Plaintiff for his sick call and also prescribed
him medication which the Plaintiff refused.  Complaint
¶ 72.

83. Plaintiff admits that every time he submitted a
sick call, at the very least, the nurses would examine
him. Dep. Pg. 30, ¶¶ 8-10.

84. Any lack of examination or treatment was due to
Plaintiff's actions, either not responding to the nurse
or creating a situation where evaluation and treatment
was not possible.  Weissman Declaration.

85. While Plaintiff claimed various needs, including a
rash, examination failed to confirm any medical
condition existed, thus rendering treatment
unnecessary.  Weissman Declaration.

86. Any deprivation that Plaintiff suffered was due to

14

his own conduct.   Weissman Declaration.

87. Plaintiff was not given Ensure due to his unwillingness to consume the Ensure as directed by staff. Weissman Declaration.

88. No reasonable health care professional, on the above record, would believe that any conduct by the staff involved, violated any right enjoyed by Plaintiff. Weissman Declaration.

89. On the contrary, all personnel involved exhibited extraordinary restraint and professionalism in the face of vile, uncooperative and potentially dangerous conduct by Plaintiff.  Weissman Declaration.

90. Plaintiff never saw Superintendent Woods throw the chemicals on him, rather he imagined Woods did. Deposition at pg. 22, ¶¶ 14-17.

91. Plaintiff admits he did not see Deputy Superintendent Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 18-20.

92. Plaintiff admits that he did not see Sergeant J. Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 21-23.

93. Plaintiff admits that he did not see Sergeant Pombrio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 24-25; pg.23, ¶ 2.

94. Plaintiff admits that he did not see Sergeant Salls ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 3-5.

95. Plaintiff admits that he did not see Sergeant Spinner ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 6-8.

96. Plaintiff never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the defendants use. Deposition at pg. 23,¶¶ 9-17.

97. [Plaintiff] does not know who was throwing the beige substance at him but imagines it was Defendants,

15

because they worked at Upstate. Deposition at pg. 24,
¶¶12-15.

98. Plaintiff has no knowledge of who was burning him
with laser beams, because he had not seen the lasers or
anyone use them. Deposition at pg. 24,¶¶16-19.

99. Plaintiff never saw anyone throw chemical agents at
him, and that he doesn't know who (if anyone) was
throwing them, but that he assumes it is Defendants
because they work at the facility. Deposition at pg.
24, ¶¶20-25.

100. Plaintiff does not allege any conduct by
Defendants Wright or Weissman regarding his treatment,
but rather names them in their capacity as Defendant
Weissman as Facility Health Director and Defendant
Wright as Medical Director and for "responsibility of
medical care of inmates".  Complaint ¶¶4, 7A, 62; ¶¶
78, 79; ¶¶ 82, 83.

101. Plaintiff never saw any defendant place anything
in his food. Dep. Pg 34, ¶¶ 18-20; Dep. Pg. 35, ¶¶ 7-8.

102. Cell searches of Plaintiff's cell were made
necessary by Plaintiff's behavior.  Specifically,
Plaintiff refused to return his tray after meals on
several occasions and broke them into pieces.  Dumas
Declaration.

103. The broken pieces then had to be recovered and the
tray reassembled to insure that all pieces were
accounted for and out of the cell.  Dumas Declaration.

104. The broken pieces present a safety and security
issue.  Dumas Declaration.

105. At no time did the staff involved enter the cell
with the purpose of destroying Plaintiff's possessions
but Plaintiff's own behavior required that the searches
be made.  Dumas Declaration.

106. Searches of his cell, delay in getting a pen and
alleged destruction of his papers delayed Plaintiff's
legal work, but it had no lasting impact, because any
deadlines he missed, he got extended and Plaintiff was
able to submit his legal papers to the court. Dep. Pg.
46, ¶¶ 3-15.

(Dkt. No. 88-1, ¶¶ 1-106).

Although Plaintiff has contested some of the facts asserted by Defendants in the motion now before the Court (Dkt. No. 88-2), his conclusory assertions do not preclude summary judgment.[4] The

_____

[4] Had this matter been before the Court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the teachings of *Ashcroft v. Iqbal*, --U.S.--, 129 S. Ct. 1937, 1949 (2009), would guide this Court. There, the Supreme Court wrote:

We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 127 S.Ct. 1955.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

*Id.* at 1949.

standard for granting summary judgment is well-known.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). In reviewing a motion for summary judgment, this Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## Personal Involvement

To allege a constitutional violation under 42 U.S.C. § 1983, a pleading must state facts sufficient to support a finding that the defendant was personally involved in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006). For this

---

The undersigned strongly believes that Plaintiff's complaint would not survive under this standard either.

reason, liability of a state official cannot be established under the doctrine of *respondeat superior*. *Iqbal*,, 129 S. Ct. at 1948.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). Moreover, a plaintiff must allege personal acts of wrong on behalf of each Defendant he names in the complaint. *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999).

In the present complaint, Plaintiff solely brings suit against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS, alleging supervisory liability. Under 42 U.S.C. § 1983 liability cannot be imposed on a supervisory official on the theory of *respondeat superior*. *Id.* In order for a supervisory official to be involved in a constitutional violation, he or she must have (1) directly participated in the alleged constitutional violation; (2) learned of the violation through a report or appeal and failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) been grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were

occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In the instant case, Plaintiff has merely alleged *respondent superior* liability against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS. The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. *Cuoco v. Moritsugu*, 222 F.3d 99, 111(2d Cir. 2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."). Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent. *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003). Similarly, the mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability. *Swindell v. Supple*, 2005 WL 267725, at *11 (S.D.N.Y. 2005); *Burgess v. Morse*, 259 F.Supp.2d 240, 250 (W.D.N.Y. 2003). Therefore, Plaintiff cannot demonstrate that Superintendent Woods and Deputy Bezio were personally involved in any alleged constitutional violation for denial of medical care and his claims against them must be dismissed.

Plaintiff also names as Defendants Dr. Evelyn Weissman, Facility Health Director and Dr. Lester Wright, the Medical Director for the Department. Once again, Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman, Facility Health Director, and Defendant Wright, Medical Director, and for "responsibility of medical care of inmates." The mere fact that Defendant Dr. Wright held the position of Medical Director and Defendant Dr. Weissman the title of Facility Health Administrator is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir. 2003); *Swindell*, 2005 WL 267725, at *9-10. Based on the above, the motion for summary judgment should be granted as to Defendants Dr. Evelyn Weissman, Dr. Lester Wright, Robert Woods, and Norman Bezio.

### Medical Indifference

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Court recognized that the government has an obligation to provide medical care for those it incarcerates, because they are unable to obtain such care on their own, and held that a prisoner may have a claim for failure to do so under the Eighth Amendment. To prevail on an Eighth Amendment claim involving prison medical care, an inmate must establish that the Defendant acted with deliberate indifference to a serious medical need. *Wilson v. Seiter*, 501 U.S. 294, 294-95

21

(1991); *West v. Atkins*, 487 U.S. 42, 46 (1988).  This indifference may be manifested by prison doctors in their response to a prisoner's needs, or by officers in intentionally denying or delaying access to medical care or treatment. *Estelle*, 429 U.S. at 104.  The inmate must prove both the subjective and objective elements of a claim: (1) deliberate indifference, and (2) a serious medical need. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  In the instant case, Plaintiff fails to satisfy either of these elements.

A review of the record pertaining to Plaintiff's complaints to prison medical personnel reveals that he complained frequently of a rash or infection on various parts of his body including his face, around his testicles, and on his penis.  There is nothing which would indicate that the rash was "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Throughout Plaintiff's complaint, he describes his rash, but never does he state that the rash caused him pain, much less extreme pain, that it was spreading anywhere else, besides the areas he already claimed, or that it was likely to produce death.

Even if the rash is a serious medical condition, the subjective element of the test is not met. To meet the subjective element, a prisoner must satisfy *Farmer v. Brennan's* test for deliberate indifference -- the Defendant must know of and disregard

an excessive risk to inmate health.  A Defendant need not expressly intend to inflict pain -- but Plaintiff must establish at least that a Defendant acted with the criminal recklessness discussed in *Farmer v. Brennan*. *See Hathaway v.Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996);  *Morales v.* Mackalm, 278 F.3d 126, 132 (2d. Cir. 2002).

Turning to the deliberate indifference element, the record is replete with evidence that Defendant medical personnel examined Plaintiff (when they were allowed to) and prescribed appropriate topical and/or allergy medicines.  Although Plaintiff may have desired some other type of medicine, that desire would have, at the very best, demonstrated negligence, not deliberate indifference.

The above analysis would apply with equal force to each medical condition reported.  The medical personnel treated or attempted to treat every condition despite abusive conduct on Plaintiff's part.  No Eighth Amendment violation on the part of the prison medical personnel is perceived.

### Powders and Lasers

Defendants J. Finazzo and G. Caron were called and requested by the Plaintiff to look into his room for substances coming from the ventilator and the roof of his cell. Both J. Finazzo and G. Caron are accused of reacting "in the shape of mockery" and said or showed to Plaintiff that they did not see the substance.  Also at Plaintiff's request, Defendants J. Spinner, S. Pombrio, B. Grant, M. Riley, S. Dumas, J. Price, J. Hyde, W. Brown, and L Furnace,

looked into the cell at the ventilator and the roof and "almost made the same gesture (as J. Finazzo and G. Caron)" and told the Plaintiff they did not see any substance.  Plaintiff alleges that Defendant B. Bogardus, would, while collecting or delivering the mail, looked towards the ventilator and roof of Plaintiff's cell and made a "gesturing of satisfaction and gladness."  Even if true, the above allegations by Plaintiff fail to state a claim with regard to looks and smirks.  Looks and smirks are not actionable.

Plaintiff alleges that Defendants S. Salls, J. Hyde, J. Bezio, S. Pombrio, J. Spinner, R. Colton, N. Guerin, D. Sauther, G. Caron, M. Riley, B. Grant, S. Dumas, B. Bogardus, M. Welch, J. Price, M. Albert, D. Ravelle, L. Furnace, J. Finazzo and W. Brown allegedly threw infectious harmful chemicals upon the Plaintiff via ventilator and the roof of his cell with a machine-like system that was allegedly placed in the room above his cell.  Plaintiff alleges that all these actions were taken in retaliation for Plaintiff's other lawsuits against other DOC's employees, yet Plaintiff concedes in his deposition that he has no proof or evidence that any named Upstate employees had any knowledge of his other lawsuits. (Dkt. No. 81-3, Ex. A at 25, ¶¶ 2-10). Tellingly, all Defendants deny knowledge of any lawsuits brought by Plaintiff at other facilities.

Equally demonstrative of the frivolous nature of the complaint, during his deposition, Plaintiff stated that he never

saw Superintendent Woods throw the chemicals on him; rather he
imagined Woods did. (Dkt. No. 81-3, Ex. A. at 22, ¶¶ 14-17).
Additionally, Plaintiff admits he did not see Defendants Deputy
Superintendent Bezio, Sergeant J. Bezio, Sergeant Pombrio, Sergeant
Salls, Sergeant Spinner, ever throw any infectious chemical on him.
(Dkt. No. 81-3, Ex. A at 22 ¶¶1-20,21-23, 24-25; 23, 2, 3-5, 6-8).
In fact, Plaintiff admits that he never saw any of the corrections
staff throw any substance in his cell, rather he believes they did
it through an apparatus, which he has never seen and never saw any
of the Defendants use. (Dkt. No. 81-3, Ex. A at 23, ¶¶ 9 -17).
Plaintiff further admits that he does not know who was throwing the
beige substance at him but imagines it was them, because they work
there.  (Dkt. No. 81-3, Ex. A. 24, ¶¶12-15).  Plaintiff also
admitted under oath that he has no knowledge of who was burning him
with laser beams, because he had not seen the lasers or anyone use
them. (Dkt. No. 81-3, Ex. A. 24,¶¶ 16-19).  Plaintiff testified
that he never saw anyone throw chemical agents at him, and that he
doesn't know who was throwing them, but that he assumes it is
Defendants because they work at the facility. (Dkt. No. 81-3, Ex.
A. 24, ¶¶ 20-25).  Similarly, while Plaintiff alleges that
Defendants, M. Riley and B. Grant, on August 14th, placed "a
strange harmful substance" in his lunch, he stated in his
deposition that he never saw either Defendant place anything in his
food on the day in question or on any other day for that matter.

25

(Dkt. No. 81-3, Ex. A. 34, ¶¶ 18-20; 35, ¶¶ 7-8).

As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions. *See, e.g. Pillay v. INS*, 45 F.3d 14, 17 (2nd Cir. 1995); *Lewis v. New York*, 547 F.2d 4, 6 (2nd Cir. 1976); *Tyler v. Carter*, 151 F.R.D. 537, 540 (S.D.N.Y. 1993) (*sua sponte* dismissing complaint alleging conspiracy to enslave and oppress), *affd* 41 F.3d 1500 (2nd Cir. 1994). A victimization fantasy, with no existence beyond Plaintiff's insistence, cannot be allowed to pass review under Fed. R. Civ. P. 56(b). "Genuine issue of material fact" must mean substantially more. Plaintiff admitted under oath that he has no facts nor evidence which states the involvement of any Defendants in somehow infecting him with "infectious harmful chemicals," or laser beams. Plaintiff's complaints are mere surmise and consist of conclusory statements that contain no specific allegations of fact indicating a deprivation of rights. Accordingly, the motion for summary judgment should be granted on this issue.

## Retaliation

Plaintiff has charged that Defendants' actions were in retaliation for him bring lawsuits against other prison employees elsewhere in the New York penal system. The use of "buzz words" such as retaliation do not cure a pleading defect such as the one herein. *See Barr v. Abrams*, 810 F.2d 358, 362 (2d Cir. 1986) (the

Second Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *see also, e.g., Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("unsupported, speculative, and conclusory" allegations should be dismissed); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[c]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse.  Virtually every prisoner can assert such a claim as to every decision which he or she dislikes); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) (where allegations of retaliation and conspiracy are "wholly conclusory," the complaint "can be dismissed on the pleadings alone"); *Justice v. Coughlin,* 941 F. Supp. 1312, 1316 (N.D.N.Y. 1996) ("In recognition of the reality that retaliation claims can be fabricated easily, [inmates] bear a somewhat heightened burden of proof, and dismissal can be granted if the claim appears insubstantial").  Therefore, Plaintiff's claims based on some retaliatory animus shall be dismissed.  *See Iqbal*, 129 S.Ct. at 1948-49.

### Cell Search

Plaintiff further alleges that Defendants B. Grant, M. Riley, and M. Welch, under orders from N. Guerin, during a cell search to look for any remaining pieces of a tray broken by the Plaintiff,

"did mess up, crush, spoil, destroy" legal documents and scattered shampoo on them as well.  On September 8, 2006, Plaintiff alleges he asked Defendants D. Ravelle, Riley, Grant, S. Dumas and Albert for a pen throughout the day.  Plaintiff alleges that no one gave Plaintiff a pen in retaliation for Plaintiff's refusal to hand in his empty food tray and, as a consequence, he broke it into pieces. Following Plaintiff's admitted refusal to give back the food tray, Defendant G. Caron and M. Albert asked Plaintiff to exit cell for a cell search. Plaintiff refused.  Following his initial refusal, Defendants J. Hyde, G. Caron, S. Dumas,and M. Albert, requested that Plaintiff leave his cell for a cell search, but Plaintiff again admittedly refused.  Following the second refusal to exit the cell, M. Tirone and J. Irvin came and asked Plaintiff to exit his cell for a cell search.  Plaintiff agreed to do so.

During the ensuing cell search, Plaintiff alleges that Defendants G. Caron, S. Dumas, M. Albert, and an unknown officer, "did mess up, crush, spoil, destroy, and mix" Plaintiff's legal documents, with the consent of J. Hyde.

This aspect of the complaint has two aspects.  The first, the legitimacy of the cell search, will not take long to address. Prison officials have every right to search a cell to retrieve broken pieces of a food tray, pieces which could easily be made into some form of a weapon.  Plaintiff in this instance was simply removed from his cell while the search ensued.

28

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)." No constitutional violation is perceived.

The second aspect of the cell search which must be addressed is Plaintiff's claim regarding the destruction of his legal papers. This claim will not delay the Court long either.

Although Plaintiff claims that the destruction of his papers delayed his legal work, he admits that it had no lasting impact as any deadlines he missed he was able to get extended and was able to submit his legal papers to the court.  Hence, as he had no actual injury even if the events as he saw them occurred, he is not entitled to relief on this aspect either.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996).

### Conclusion

Accordingly,

**IT IS ORDERED** Defendants' motion for summary judgment be, and the same here by is, **GRANTED.**

29

This the 22nd day of February, 2010.



Signed By:

***Joseph M. Hood***

**Senior U.S. District Judge**

**Sitting by Designation**